# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-01273-SCT

*THE PROMENADE D'IBERVILLE, LLC*

*v.*

*JACKSONVILLE ELECTRIC AUTHORITY*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/11/2023 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JAMES GRADY WYLY, III |
| | JOSEPH JEFFREY LANDEN |
| | JOHN PATRICK McMACKIN |
| | KYLE STUART MORAN |
| ATTORNEYS FOR APPELLEE: | HUGH RUSTON COMLEY |
| | JOE SAM OWEN |
| | PAUL STEPHENSON |
| | JAMES JOSEPH CRONGEYER, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 06/12/2025 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH
## NO. 2017-IA-00167-SCT

### BEFORE RANDOLPH, C.J., MAXWELL AND SULLIVAN, JJ.

### SULLIVAN, JUSTICE, FOR THE COURT:

¶1. The Harrison County Circuit Court granted Jacksonville Electric Authority's (JEA's) motion to dismiss for lack of subject-matter jurisdiction based on sovereign immunity pursuant to *California Franchise Tax Board v. Hyatt (Hyatt III)*, 587 U.S. 230, 139 S. Ct. 1485, 203 L. Ed. 2d 768 (2019). Alternatively, the trial court held that the Full Faith and Credit Clause and comity principles mandated dismissal due to the presuit notice and venue

requirements under Florida Statute Section 768.28. Promenade D'Iberville, LLC, appeals.

¶2. Because we find that *Hyatt III* does not apply in this case and that neither the Full Faith and Credit Clause nor comity mandate dismissal, we reverse the trial court's judgment of dismissal. The case is remanded to the Harrison County Circuit Court for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶3. Promenade is the owner and developer of a large retail shopping center in D'Iberville, Mississippi. The facility covers seventy-three acres and accommodates more than fifty commercial tenants. Construction began on the facility in 2008 and was completed in the fall of 2009. In the spring of 2009, Promenade discovered heaving and swelling problems with the soil underneath the facility while construction was ongoing.

¶4. In 2010, Promenade filed suit in the Harrison County Circuit Court against the project's general contractor, EMJ Corporation; the sitework contractor, M. Hanna Construction Company, Inc.; geotechnical engineer Gallet & Associates, Inc.; a Louisiana materials supplier, LA Ash; and JEA, a Florida public utility. The complaint alleged damages caused from the use of OPF42 as a soil stabilizer in the construction of the shopping center. The complaint asserted claims of defective product, failure to warn, breach of duty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of express warranty, and physical invasion to land.

¶5. The OPF42 was purchased from LA Ash and used at the project by M. Hanna. The complaint alleged that the OPF42 reacted chemically when exposed to water, forming

2

ettringite crystals and causing rapid soil expansion. This expansion caused extensive property damage, including buckled and cracked floors, cracks and separation in walls, and damage to pavement and sidewalks.[1]

¶6. The main component of the OPF42 used at the site was bed ash material from JEA's power plant in Florida, a byproduct from the plant's electric generation process. Promenade alleged that JEA had supplied the bed ash to LA Ash, which had marketed and sold the OPF42 used in the project. According to Promenade, JEA had intended that its byproduct be used in construction projects such as the D'Iberville shopping center.

¶7. JEA answered Promenade's complaint and filed a motion to dismiss for lack of subject-matter jurisdiction. JEA asserted, *inter alia*, that as a sovereign entity of the State of Florida, it could not be sued in the courts of a sister state, Mississippi. JEA contended that Promenade had conceded that JEA had sovereign status by using Florida's Public Records Act to obtain "volumes" of data from JEA. Alternatively, JEA argued that it was immune from suit to the extent provided by either Florida's immunity provisions or the Mississippi Tort Claims Act (MTCA).

¶8. At that time, JEA acknowledged that under *Franchise Tax Board of California v. Hyatt (Hyatt I)*, 538 U.S. 488, 123 S. Ct. 1683, 155 L. Ed. 2d 702 (2003), a sovereign body of one state is *not* constitutionally immune from suit in the courts of a sister state. JEA instead argued that Mississippi should decline to exercise jurisdiction over Promenade's claims against it as a matter of comity, "an accommodation policy, under which the courts

---

[1] This type of expansion is referred to throughout the record as "heaving."

of one state voluntarily give effect to the laws and judicial decisions of another state out of deference and respect, to promote harmonious interstate relations[.]" *Id.* at 493 (internal quotation marks omitted).

¶9.     A special master was appointed in the case. The special master rejected JEA's comity argument and recommended that JEA's motion to dismiss be denied. The special master reviewed *Church v. Massey*, 697 So. 2d 407, 409 (Miss. 1997), which involved a Mississippi resident injured in a traffic accident by an employee of Brewer State Junior College, an Alabama entity. Brewer State argued that Alabama law applied and that because it was immune from suit in Alabama, it should be immune from suit in Mississippi. *Id.* The trial court dismissed the Mississippi resident's lawsuit against Brewer State as a matter of comity. *Id.* The *Church* Court found that the matter did "not present a question dealing with the principle of comity[;]" instead, the case presented "a classic choice of law problem." *Id.* at 410. *Church* reiterated that "Mississippi has [subscribed] to the most significant relationship test embodied in the Restatement (Second) of Conflicts of Law." *Id.* (quoting *McDaniel v. Ritter*, 556 So. 2d 303, 310 (Miss. 1989)). *Church* resolved the test in favor of applying Mississippi law. *Id.* *Church* held that "[a] foreign governmental entity enjoys no greater status under our tort law than any other similarly situated tort defendant." *Id.* *Church* found "no compelling public policy considerations which would dictate that Brewer State Junior College should enjoy immunities above and beyond those provided to our citizens." *Id.* Thus, the MTCA afforded no immunity to the Alabama governmental entity. *Id.*

¶10.    The special master found that under *Hyatt I* and an earlier case, *Nevada v. Hall*, 440

4

U.S. 410, 99 S. Ct. 1182, 59 L. Ed. 2d 416 (1979), later overruled by *Hyatt III*, 587 U.S. at 233,[2] no constitutional impediment existed to prevent the court's exercise of subject matter jurisdiction over JEA, a Florida municipal entity. The special master found that under the most significant relationship test and the center of gravity test, Mississippi law applied. Applying *Church*, the special master found that JEA's status as a "municipal utility and body politic of the State of Florida" did not afford it any immunity from suit under the MTCA. The special master found that "JEA is not an employee or political subdivision nor enjoys any other status that would provide the protection afforded under the Mississippi Tort Claims Act." The trial court adopted the special master's report and recommendation and denied JEA's motion to dismiss for lack of subject matter jurisdiction.

¶11.    After its motion to dismiss was denied, JEA moved for summary judgment. It argued that its only role had been supplying bed ash in rail carloads to LA Ash, which then had manufactured and sold a soil stabilization and fill product for the Promenade project. JEA denied any role in manufacturing the fill material, contending it merely had supplied a raw material that had been altered by LA Ash after it left JEA's control. JEA averred that it had

---

[2]  In *Hall*, California residents were injured in an automobile accident negligently caused by a University of Nevada employee driving a University of Nevada vehicle in California. 440 U.S. at 411. The California Supreme Court held that the State of Nevada was amenable to suit in California courts, and it upheld a $1,150,000 damages award against the State of Nevada despite a Nevada statute that placed a $25,000 cap on damages in tort actions against the state. *Id.* at 411-12. The United States Supreme Court affirmed, holding that the United States Constitution "does not confer sovereign immunity on States in courts of sister States." *Hyatt I*, 538 U.S. at 497 (citing *Hall*, 440 U.S. at 414-21). And "the Full Faith and Credit Clause did not require California to apply Nevada's sovereign immunity statutes where such application would violate California's own legitimate public policy." *Hyatt I*, 538 U.S at 497 (citing *Hall*, 440 U.S. at 424).

lacked any knowledge that LA Ash would sell it for use in the Promenade project. JEA admitted that the process used by LA Ash to convert JEA's bed ash to the fill material consisted of putting water on it, or hydrating it, using a water bath. And it admitted that a "byproduct marketing agreement" had existed between JEA and LA Ash, but it urged that the agreement had been terminated in 2008 before the fill material at issue had been sold for use in the Promenade project. JEA denied any agency relationship with LA Ash.

¶12.    In response, Promenade argued that genuine issues of material fact existed on each of its claims against JEA. Promenade submitted evidence that bed ash is regulated by the Florida Department of Environmental Protection (FDEP) as solid waste. But the FDEP can grant an exemption of industrial byproducts, such as bed ash, from this restriction if they are beneficially used. In July 2005, FDEP granted a Beneficial Use Determination (BUD) to JEA for EZ Base, a product JEA made from bed ash at the Northside Generating Station. The BUD approved several of JEA's proposed uses for EZ Base, including top surface for roads and in civil road construction applications, provided the conditions of the BUD were met. The BUD said that "any other uses of the material which involve placing it into or upon any land or water may be considered disposal of solid waste by the Department." The BUD placed restrictions on the manner in which EZ Base would be applied to prevent environmental contamination. The BUD also placed duties on JEA to conduct sampling and testing, to monitor the chemical characteristics of the product, and to maintain records. Another requirement was that "a majority of the industrial byproducts [must be] demonstrated to be sold, used, or reused within one year." The BUD said that "This approval

letter . . . applies only to the engineered uses of EZ Base listed above . . . ." Thus, FDEP approval for use of JEA's bed ash within Florida extended only to EZ Base and to those uses of EZ Base allowed by the BUD.

¶13.    Promenade claimed that because JEA's bed ash production had been exceeding storage capacity at the facility in Florida and JEA could not obtain FDEP approval to market all of it inside Florida, JEA had contracted with LA Ash to market the bed ash in other states for use as fill material in construction projects. In September 2003, LA Ash and JEA entered into the byproduct marketing agreement providing for the sale of JEA's bed ash both within and outside Florida. The BUD JEA had obtained in 2005 allowed JEA to use some of its bed ash in Florida but only bed ash designated as EZ Base.

¶14.    In 2008, due to liability concerns that arose after users experienced problems with the bed ash, JEA cancelled its contract with LA Ash. But JEA continued to pay LA Ash $2,100 per loaded rail car to remove bed ash from its facilities in Florida to LA Ash's facility in Port Bienville, Mississippi. Promenade asserted that LA Ash had acted as JEA's agent in its sale of bed ash for use in the Promenade project.

¶15.    According to Promenade, JEA's internal documentation shows its officials had determined that paying LA Ash to haul away and market the bed ash would be much cheaper than paying for landfill disposal in Florida. A JEA market opportunity profile report on the southeastern United States had identified Mississippi as a "Low Barrier to Entry State" for selling ash byproducts as construction material. Scott Shultz, JEA's director of byproduct services, testified in his deposition that JEA had three options for dealing with the ash

7

produced as a byproduct of electricity generation: (1) it could be shipped by rail car to LA Ash, (2) it could be processed into EZ Base for use in Florida under the BUD, or (3) it could be trucked to a landfill, an option that Shultz said was costly.

¶16.    Shultz testified that the bed ash used at Promenade was not EZ Base. According to Shultz, EZ Base is ash that is hydrated onsite by JEA. JEA marketed and sold EZ Base for use in several construction projects in Florida pursuant to the BUD.[3] Shultz explained that, unlike EZ Base, the bed ash used at Promenade was dry when it left JEA. Because the BUD applied only to EZ Base, the bed ash used at the Promenade project was outside the scope of the BUD. The bed ash used at Promenade had not been approved for use as construction fill in Florida.

¶17.    Promenade argued that evidence showed the construction fill used at the mall was not a raw material, was defective when it left JEA, and was in substantially the same condition when it was installed at Promenade. Promenade contended that, unbeknownst to LA Ash, JEA had introduced powdered Kaolin, an aluminum silicate, into its fuel mixture, which had yielded bed ash that was unsuitable for use as construction fill.  And Promenade argued that the contractors and engineers on the Promenade project had no way of knowing that the bed ash that ultimately was delivered to the construction site had been adulterated by aluminum.

¶18.    Promenade attached an expert opinion that testing had shown the expansion of subsurface materials had been caused by the formation of ettringite crystals.  According to the expert, environmental science professor Dr. George C. Flowers, the hydration process

---

[3] An expert report commissioned by JEA showed that several of these projects in Florida incurred damage similar to what occurred at Promenade.

8

used by LA Ash would not have eliminated the specific ingredient, aluminum, that had caused delayed ettringite crystal formation. Dr. Flowers opined that, "[i]n light of its potential to expand over time, a product with these qualities is not fit or appropriate for the particular purpose of being used in soils under improvements such as pavements or structures." Promenade asserted that JEA's internal documents showed the company had been aware of this problem. In its reply, JEA again asserted that it had sent a raw material to LA Ash, which LA Ash had processed and converted to the fill material.

¶19. During the pendency of JEA's summary-judgment motion, Promenade filed a motion for leave to amend its complaint to add claims for physical invasion of property under theories of nuisance, nuisance *per se*, and trespass, common plan or design, and for its demand for relief to include punitive damages. The trial court granted leave to amend, and Promenade filed the amended complaint, which JEA answered. JEA moved for summary judgment on Promenade's additional claims, and Promenade moved for summary judgment on its physical invasion claim.

¶20. The trial court denied JEA's motion for summary judgment and both parties' motions for partial summary judgment. And trial was set to begin in October 2016.

¶21. Prior to trial, the United States Supreme Court handed down *Franchise Tax Board of California v. Hyatt (Hyatt II)*, 578 U.S. 171, 136 S. Ct. 1277, 194 L. Ed. 2d 431 (2016). *Hyatt II* held that the Full Faith and Credit Clause prevents a state from applying its damages law in a manner that "reflects a special, and constitutionally forbidden, "'policy of hostility to the public Acts' of a sister State[.]" *Hyatt II*, 578 U.S. at 173-74 (internal quotation marks

9

omitted) (quoting *Hyatt I* 538 U.S. at 499).

¶22.   JEA thereafter filed a motion to reconsider its comity arguments in light of *Hyatt II*. JEA argued that *Hyatt II* abrogated this Court's decision in *Church v. Massey* that a public entity of another state would be treated no differently under Mississippi law than a private tortfeasor and would not be afforded the benefits of the MTCA.

¶23.   Given the implications of *Hyatt II*, the trial court cancelled the scheduled trial.  In addition to responding to JEA's motion to reconsider, Promenade requested that if the trial court determined that *Hyatt II* applied, that Promenade be allowed to amend its complaint to add a claim for inverse condemnation under the Mississippi Constitution.

¶24.   After briefing and oral argument, the trial court resolved all these issues in its "Omnibus *Hyatt II* Order."  The trial court found that JEA is a "municipal utility and body politic located in the State of Florida" and recognized that Florida courts have held that Florida's statutory waiver of sovereign immunity extends to JEA.  The trial court ruled that JEA is a foreign governmental entity entitled to the protection afforded under *Hyatt II*.

¶25.   The trial court found that under *Hyatt II*, denying JEA a cap on damages would be inconsistent with both Florida[4] and Mississippi law and would amount to a special rule of law evincing a policy of hostility to Florida contrary to the Full Faith and Credit Clause.  Thus, the trial court found that under *Hyatt II*, the court was "required to afford JEA the protection of a damages cap so as not to unconstitutionally apply a special rule of Mississippi law that is hostile to the sovereign status of its sister State of Florida.  To do otherwise would be in

---

[4] Florida law would provide JEA immunity above $200,000 in this lawsuit. Fla. Stat. § 768.28(5).

10

violation of the Full Faith and Credit Clause." Accordingly, the trial court ruled that Promenade's available damages would be limited to the $500,000 cap provided by the MTCA.

¶26. The trial court denied Promenade's motion to amend the complaint to add a claim for inverse condemnation. It granted JEA's motion for partial summary judgment on injunctive relief. Finally, the trial court found that the property damage at the Promenade site was a single occurrence for the purpose of the MTCA's damages cap. Miss. Code Ann. § 11-46-15 (Rev. 2019).[5]

¶27. Promenade petitioned this Court for interlocutory appeal, which was granted. While the interlocutory appeal was pending, the Supreme Court handed down *Hyatt III*, which overruled *Nevada v. Hall*. *Hyatt III* held that the United States Constitution does not "permit[] a State to be sued by a private party without its consent in the courts of a different State." *Hyatt III*, 587 U.S. at 233.

¶28. In view of *Hyatt III*, this Court subsequently dismissed the interlocutory appeal and remanded the case to the trial court for further consideration based on *Hyatt III*. En Banc Order, *The Promenade D'Iberville, LCC v. Jacksonville Elec. Auth.*, No. 2017-IA-00167-SCT (Miss. May 16, 2019).

¶29. On remand, the trial court granted JEA's motion to dismiss for lack of subject matter

---

[5] In its order granting partial summary judgment in favor of JEA, the trial court rejected Promenade's claim of 437 occurrences for each truckload of OPF42 delivered to the project in its claim for damages. The trial court ruled that there was one occurrence—thus, the trial court capped Promenade's potential damages award at $500,000.

11

jurisdiction. The trial court found that it has no jurisdiction over JEA pursuant to **Hyatt III**. Alternatively, the trial court dismissed JEA from the suit because both comity and full faith and credit mandate dismissal due to the presuit notice and home-venue requirements under Florida law.

¶30. Promenade appeals from the trial court's judgment of dismissal. It claims that (1) **Hyatt III** does not limit Mississippi's exercise of jurisdiction over a nonstate entity such as JEA; (2) under the circumstances of this case and the analytical framework provided in **Hyatt II**, JEA was not entitled to final dismissal; (3) depriving Promenade the opportunity to conform its complaint and proof to the new "inter-state" immunity framework adopted by the trial court is patently unfair; and (4) in the event the trial court's extension of **Hyatt II** stands, Promenade should be allowed to present its claims for injunctive relief to the fact-finder rather than suffer dismissal.

## DISCUSSION

### I. *Hyatt*

¶31. This is a case of first impression for this Court regarding the application of **Hyatt III**.[6] Because the trial court's order dismissing JEA primarily relies on **Hyatt III** and **Hyatt II**, we provide a brief summary of all three **Hyatt** decisions.

¶32. They involve a dispute between a former California resident, Gilbert Hyatt, who

---

[6] This Court briefly discussed *Hyatt III* in *University of South Alabama ex rel. USA Health University Hospital (In re Estate of Matute) v. Perez*, 293 So. 3d 224, 227 (Miss. 2020), in which the University of South Alabama (USA) claimed sovereignty immunity in an estate case. But this Court did not decide *Hyatt III*'s applicability in the case since USA had agreed that the chancery court had jurisdiction to adjudicate its probated claim against the estate. *Id.*

relocated to Nevada in the early 1990s, and the California Franchise Tax Board (Board). *Hyatt I*, 538 U.S. at 490-91. After Hyatt left California, the Board audited Hyatt to determine whether he had underpaid state income taxes by misrepresenting when he became a Nevada resident. *Id.* The Board determined that Hyatt was still a California resident beyond the date he represented on his tax return that he became a Nevada resident. *Id.* at 490. The Board "issued notices of proposed assessments . . . and imposed substantial civil fraud penalties." *Id.* at 491. Hyatt challenged the assessments through the Board's administrative process. *Id.*

¶33. While those proceedings were pending in California, Hyatt filed suit against the Board in a Nevada trial court. *Id.* He claimed the Board had committed numerous torts during the audit, "including invasion of privacy, outrageous conduct, abuse of process, fraud, and negligent misrepresentation." *Id.*

¶34. The Board petitioned the Nevada Supreme Court for a writ of mandamus ordering dismissal of the case based on jurisdiction. *Id.* The Nevada Supreme Court held that the trial court "'should have declined to exercise its jurisdiction over the underlying negligence claim under comity principles' but that the intentional tort claims could proceed to trial." *Id.* at 492.

¶35. The Nevada Supreme Court recognized that while Nevada law does not allow its state agencies to claim immunity "for intentional torts committed within the course and scope of employment," California law "expressly provide[s] [the Board] with complete immunity." *Id.* at 492-93 (internal quotation mark omitted). The Nevada Supreme Court explained that

13

the Board's statutory immunity for negligent acts would "not contravene any Nevada interest in this case." *Id.* at 493 (internal quotation mark omitted). But "affording [the Board] statutory immunity" with regard to the intentional torts, would contravene "Nevada's policies and interests in this case." *Id.* (internal quotation marks omitted). Therefore, "'Nevada's interest in protecting its citizens from injurious intentional torts and bad faith acts committed by sister states' government employees,' should be accorded greater weight 'than California's policy favoring complete immunity for its taxation agency.'" *Id.* at 493-94.

¶36. On certiorari, the United States Supreme Court unanimously affirmed the judgment of the Nevada Supreme Court. *Id.* *Hyatt I* concluded that "the Full Faith and Credit Clause does not compel "'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate."'" *Id.* at 494 (quoting *Sun Oil Co. v. Wortman*, 486 U.S. 717, 722, 108 S. Ct. 2117, 100 L. Ed. 2d 743 (1988)). *Hyatt I* held that "[t]he Nevada Supreme Court sensitively applied principles of comity with a healthy regard for California's sovereign status, relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis." *Id.* at 499.

¶37. On remand, a Nevada jury awarded Hyatt approximately $450 million in compensatory and punitive damages. *Hyatt II*, 578 U.S. at 175. California appealed to the Nevada Supreme Court, arguing that Nevada statutes would impose a $50,000 cap on damages were this a suit against Nevada officials. *Id.* The Nevada Supreme Court rejected California's argument; instead, the Nevada Supreme Court reduced the damages award to

14

$1 million for Hyatt's fraud claim. *Id.*[7]

¶38.    The United States Supreme Court granted California's petition for certiorari, agreeing to decide two questions: "First, whether to overrule *Hall*." *Hyatt II*, 578 U.S. at 175. Second, were *Hall* not overruled, whether "the Constitution permits Nevada to award Hyatt damages against a California state agency that are greater than those that Nevada would award in a similar suit against its own state agencies." *Id.* at 175-76.

¶39.    The *Hyatt II* Court divided four-to-four on whether to overrule *Hall*. *Id.* at 176. On the second question, *Hyatt II* held that by allowing for damages greater than the amount limited to its own agencies, Nevada "applied a special rule of law applicable only in lawsuits against its sister States, such as California." *Id.* at 178. Such a rule "reflects a special, and constitutionally forbidden, '"policy of hostility to the public Acts" of a sister State,' namely, California." *Id.* at 173 (quoting U.S. Const. art. IV, § 1 (Full Faith and Credit Clause); *Hyatt I*, 538 U.S. at 499)). *Hyatt II* said that, "viewed through a full faith and credit lens, a State that disregards its own ordinary legal principles on this ground *is* hostile to another State." *Id.* at 178. "In light of the 'constitutional equality' among the States, Nevada has not offered 'sufficient policy considerations' to justify the application of a special rule of Nevada law that discriminates against its sister States." *Id.* at 179 (citations omitted).

---

[7]  The Nevada Supreme Court remanded for a retrial on the question of damages for Hyatt's intentional infliction emotional distress claim, and it stated that such damages are not subject to any statutory cap. *Hyatt I*, 578 U.S. at 175. Based on comity principles, the Nevada Supreme Court held that Hyatt was precluded from recovering punitive damages from the Board "[b]ecause punitive damages would not be available against a Nevada government entity . . . ." *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 154 (Nev. 2014), *overruled by Hyatt II*, 578 U.S. 171.

15

¶40.  Chief Justice Roberts wrote a dissenting opinion joined by Justice Thomas.  *Id.* at 180-88 (Roberts, C.J., dissenting).  The dissent said that the majority's "decision is contrary to our precedent holding that the [Full Faith and Credit] Clause does not block a State from applying its own law to redress an injury within its own borders."  *Id.* at 181.  The dissent opined that even if the majority "is correct that Nevada violated the Full Faith and Credit Clause . . . it is wrong about the remedy."  *Id.* at 188.   The majority "does not require the Nevada Supreme Court to apply either Nevada law (no immunity for the Board) or California law (complete immunity for the Board), but instead requires a new hybrid rule, under which the Board enjoys partial immunity."  *Id.*  According to the dissent,

> The majority's approach is nowhere to be found in the Full Faith and Credit Clause.  Where the Clause applies, it expressly requires a State to give full faith and credit to another State's laws.  If the majority is correct that Nevada has no sufficient policy justification for applying Nevada immunity law, then California law applies.  And under California law, the Board is entitled to full immunity. Or, if Nevada has a sufficient policy reason to apply its own law, then Nevada law applies, and the Board is subject to full liability.

*Id.* at 188.

¶41.  On remand, the Nevada Supreme Court instructed the trial court to enter damages in accordance with the statutory cap for Nevada agencies.  *Hyatt III*, 587 U.S. at 235.  California again petitioned for certiorari, which the Supreme Court granted on "[t]he sole question . . . [of] whether *Nevada v. Hall* should be overruled."  *Hyatt III*, 587 U.S. at 235.

¶42.  In a five-to-four decision, *Hyatt III*, authored by Justice Thomas, overruled *Hall* and held that "the Constitution [does not] permit[] a State to be sued by a private party without its consent in the courts of a different State."  *Hyatt III*, 587 U.S. at 233.  *Hyatt III* said that

16

*Nevada v. Hall* "is contrary to our constitutional design and the understanding of sovereign immunity shared by the States that ratified the Constitution." *Hyatt III*, 587 U.S. at 236.

¶43.    *Hyatt III* said that "[a]fter independence, the States considered themselves fully sovereign nations." *Id.* at 238.  And "'[a]n integral component' of the States' sovereignty was 'their immunity from private suits.'" *Id.* (quoting *Fed. Mar. Comm'n v. S.C. Ports Auth.*, 535 U.S. 743, 751-52, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002)).  Hence, "[t]he founding generation thus took as given that States could not be haled involuntarily before each other's courts." *Id.* at 239. Rather, "the only forums in which the States have consented to suits by one another and by the Federal Government are Article III courts." *Id.* at 241.

¶44.    *Hyatt III* explained that there were fears early on that Article III would be construed as having "implicitly waived the State's sovereign immunity against *private* suits in federal courts." *Id.* at 242.  "But '[t]he leading advocates of the Constitution assured the people in no uncertain terms' that this reading was incorrect.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 713, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999)).  These fears, however, were soon realized with the Court's decision in *Chisholm v. Georgia*, 2 U.S. 419, 1 L. Ed. 440 (1793), which held that "Article III allowed the very suits that the 'Madison-Marshall-Hamilton triumvirate' insisted it did not." *Hyatt III*, 587 U.S. at 242 (quoting *Hall*, 440 U.S. at 437 (Rehnquist, J., dissenting)).  *Hyatt III* said that "decision precipitated an immediate 'furor' and 'uproar' across the country." *Id.* 242-43.  Congress and the states then "acted swiftly to remedy the Court's blunder by drafting the Eleventh Amendment." *Id.* at 243.

¶45.    *Hyatt III* said "[t]he Eleventh Amendment confirmed that the Constitution was not

meant to 'rais[e] up' any suits against the States that were 'anomalous and unheard of when the Constitution was adopted.'" ***Id.*** (second alteration in original) (quoting ***Hans v. Louisiana***, 134 U.S. 1, 18, 10 S. Ct. 504, 33 L. Ed. 842 (1890)). "In proposing the Amendment, 'Congress acted not to change but to restore the original constitutional design.'" ***Id.*** (quoting ***Alden***, 527 U.S. at 722). ***Hyatt III*** reiterated that "'sovereign immunity of the States' . . . 'neither derives from nor is limited by, the terms of the Eleventh Amendment.'" ***Id.*** (quoting ***Alden***, 527 U.S. at 713).

¶46.   ***Hyatt III*** concluded that "***Nevada v. Hall*** is irreconcilable with our constitutional structure and with the historical evidence showing a widespread preratification understanding that States retained immunity from private suits, both in their own courts and in other courts." ***Id.*** at 249. ***Hyatt III*** held that the Board is immune from Hyatt's suit in Nevada's courts. ***Id.***

## II.    Post-*Hyatt III*

¶47.   As the trial court noted, there are relatively few decisions so far from other jurisdictions considering ***Hyatt III***.

¶48.   The most recent is from Pennsylvania, ***Galette v. NJ Transit***, 332 A.3d 776, 779 (Pa. 2025), which involved a traffic accident between a bus owned and operated by New Jersey Transit Corporation (NJ Transit) and a Pennsylvania resident. The resident sued NJ Transit for negligence in a Pennsylvania state court. ***Id.*** The ***Galette*** court concluded that NJ Transit is an entity of the State of New Jersey "created as an instrumentality of that State." ***Id.*** at 791. ***Galette*** held that, consistent with ***Hyatt III***, "interstate sovereign immunity precludes"

18

the plaintiff's suit in Pennsylvania. *Id.*

¶49.   New York's highest court, however, reached a different conclusion. *Colt v. New Jersey Transit Corp.*, No. 72, 2024 WL 4874365 (N.Y. Nov. 25, 2024) (unpublished decision). In a negligence case involving a NJ Transit bus and a New York pedestrian, the *Colt* court concluded that NJ Transit "is not an arm of New Jersey and may not invoke sovereign immunity" in a New York state court. *Id.* at *7.

¶50.   In *Farmer v. Troy University*, 879 S.E.2d 124, 128 (N.C. 2022), the North Carolina Supreme Court held that Troy University was an arm of the State of Alabama, and, under *Hyatt III*, is "entitled to sovereign immunity from suit without its consent in the state courts of every state in the country." The *Farmer* court also held, however, that Troy University had explicitly waived its sovereign immunity from suit in North Carolina when it "conducted business in North Carolina, while knowing it was subject to the North Carolina Nonprofit Corporation Act and its sue and be sued clause . . . ." *Farmer,* 879 S.E.2d at 131.

¶51.   Both the New York Court of Appeals and the Pennsylvania Supreme Court looked to Eleventh Amendment jurisprudence for guidance in determining whether an entity is an extension of the state for purposes of interstate immunity. *Colt*, 2024 WL 4874365, at **3-5; *Galette*, 332 A.3d at 786-87.

¶52.   The *Colt* court said its "analysis aligns with the framework many courts apply in analyzing whether a state-created entity may invoke sovereign immunity in federal court—often called Eleventh Amendment immunity—which is rooted in the same pre-ratification notions of State dignity." *Colt*, 2024 WL 4874365, at *3 (footnote omitted)

19

(citations omitted). *Colt* held that when "considering whether a foreign state-created entity is entitled to sovereign immunity in New York, courts should consider: (1) how the State defines the entity and its functions, (2) the State's power to direct the entity's conduct, and (3) the effect on the State of a judgment against the entity."

*Id.* at *5.

¶53.  The *Galette* court found that a six-factor test previously articulated by the Pennsylvania Supreme Court in a state case[8] "lends insight into whether a state-created entity is designed to act as either: (1) an arm of the State that enjoys the immunity associated with the Eleventh Amendment; or (2) something separate from the State, such as a corporation, that is not shielded by such immunity." *Galette*, 332 A.3d at 787 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) ("The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.")).

¶54.  The *Farmer* court did not speak to Eleventh Amendment jurisprudence. *Farmer* simply concluded that Troy University, like North Carolina state institutions of higher learning, is deemed to be an arm of the state protected by sovereign immunity. *Farmer*, 879 S.E.2d at 127-28.

---

[8] *Galette* referred to *Goldman v. Southeast Pennsylvania Transportation Authority*, 57 A.3d 1154, 1185 (Pa. 2012), in which the Pennsylvania Supreme Court concluded that the Southeastern Pennsylvania Transportation Authority was not an arm of Pennsylvania "and thus not entitled to immunity under the Eleventh Amendment."

20

¶55. The Utah Supreme Court acknowledged *Hyatt III* in a negligence case brought against an Arizona municipality by a Utah resident seeking damages for injuries from a motor vehicle accident with an Arizona municipal employee. *Galindo v. City of Flagstaff*, 452 P.3d 1185, 1186 (Utah 2019). In a footnote, however, *Galindo* said it was unnecessary to address *Hyatt III*'s "sea change in sovereign immunity practice because 'municipalities, unlike States, do not enjoy a constitutionally protected immunity from suit' under the Eleventh Amendment . . . ." *Id.* at 1187 n.2 (quoting *Jinks v. Richland Cnty.*, 538 U.S. 456, 466, 123 S. Ct. 1667, 155 L. Ed. 2d 631 (2003)).

¶56. *Galindo* expressed that "[i]t is important to clarify that sovereign immunity does not flow from the Eleventh Amendment[;] [rather,] [s]overeign immunity is a concept the founders 'took as given.'" *Id.* (quoting *Hyatt III*, 587 U.S. at 239). *Galindo* recognized that early in the country's history, numerous courts held that sovereign immunity extended to political subdivisions. *Id.* But "courts found ways to chip away at its scope, until it became a rarity." *Id.*

¶57. *Galindo* concluded that

> Under either of these interpretations of the development of political subdivision immunity, *Hyatt*—which addressed constitutionally protected sovereign immunity—does not apply to political subdivisions. The principles set forth in *Hall* continue to govern a state's governmental immunity grant to its political subdivisions and the respect that should be attributed to it by other states.

*Id.*

### III. JEA's Status

¶58. JEA conceded to the trial court that it is not an arm of the State of Florida for Eleventh

21

Amendment purposes. But it maintains that it still enjoys the same "pre-ratification" immunity status as contemplated by *Hyatt III*, 587 U.S. 230. JEA contends that no court or plaintiff has made the argument that when *Hyatt III* uses the word "State," it means only one of the fifty States. *Id.* JEA argues that if this were so, it would have been completely unnecessary for *Hyatt III* to discuss the holding in *Hall* when a "State" was not the party. *Id.* JEA further submits that *Hyatt III* was applied not to California but to its agency, the Board, which had immunity granted by a California statute. *Id.*

¶59. JEA also relies on *Cauley v. City of Jacksonville*, 403 So. 2d 379, 381 (Fla. 1981), in which the Florida Supreme Court said that in Florida, "[p]rior to 1776, the common law doctrine of sovereign immunity applied without distinction between governmental entities." And "[t]here was no statutory right to recover for a municipality's negligence predating the adoption of the declaration of rights contained in the Florida constitution, nor was there a cause of action at common law as of July 4, 1776, adopted under section 2.01, Florida Statutes." *Id.* at 385.

¶60. At the outset, and contrary to JEA's suggestion otherwise, the State of Nevada, itself, was a party throughout the trial and appeals process in *Hall*. *See Hall*, 440 U.S. at 411-12 ("Respondents filed this suit for damages in the Superior Court for the city of San Francisco, naming the administrator of the driver's estate, the University, and the State of Nevada as defendants."). And while the State of California was not a party in the *Hyatt* cases, federal courts have recognized that the Board is, nevertheless, an arm of that state and enjoys Eleventh Amendment immunity. *See, e.g.*, *Davis v. California*, 734 Fed. Appx. 560, 564 n.6

22

(10th Cir. 2018) ("States and their agencies 'enjoy sovereign immunity from suit under the Eleventh Amendment.'" (quoting *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012))).

¶61.   With regard to the Florida Supreme Court's decision in *Cauley*, we read it differently than JEA.   At issue in *Cauley* was the constitutionality of a damages cap in tort actions against a municipality under Florida Statute Section 768.28(5).   *Cauley*, 403 So. 2d at 380. The *Cauley* court began its discussion by explaining that "[c]ommon law sovereign immunity for the state, its agencies, and counties remained in full force until section 768.28's enactment."   *Id.* at 381.   But unlike with those entities, Florida courts, starting with *City of Tallahassee v. Fortune*, 3 Fla. 19 (1850), "began to except certain municipal activities from the sovereign immunity rule."   *Cauley*, 403 So. 2d at 382.   What resulted were certain rules governing municipal immunity prior to the enactment of section 768.28:

> 1) as to those municipal activities which fall in the category of proprietary functions a municipality has the same tort liability as a private corporation;
>
> 2) as to those activities which fall in the category of governmental functions ". . . a municipality is liable in tort, under the doctrine of respondent (sic) superior, (. .) only when such tort is committed against one with whom the agent or employee is in privity, or with whom he is dealing or is otherwise in contact in a direct transaction or confrontation."
>
> 3) as to those activities which fall in the category of judicial, quasi judicial, legislative, and quasi legislative functions, a municipality remains immune.

*Cauley*, 403 So. 2d at 383 (alterations in original) (quoting *Gordon v. City of West Palm Beach*, 321 So. 2d 78, 80 (Fla. Dist. Ct. App. 1975), *superseded by* § 768.28); *see also* *Com. Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1015 (Fla. 1979) (reviewing the

23

history of municipal sovereign immunity and recognizing that before section 768.28, a municipality would be held liable for torts committed in the performance of proprietary acts).

¶62. We find nothing provided by either ***Hyatt III*** or Florida case law demonstrates to us that JEA enjoys the same "pre-ratification" (or now, "interstate") immunity status as contemplated by ***Hyatt III***, 587 U.S. 230. JEA is not an arm of the State of Florida; rather, it is "an electric utility operated by the City of Jacksonville" and is an instrumentality of that municipality. ***Jetton v. Jacksonville Elec. Auth.***, 399 So. 2d 396, 398 (Fla. Dist. Ct. App. 1981) (citing ***Ven-Fuel v. Jacksonville Elec. Auth.***, 332 So. 2d 81 (Fla. Dist. Ct. App. 1975); ***Amerson v. Jacksonville Elec. Auth.***, 362 So. 2d 433 (Fla. Dist Ct. App. 1978)). What it enjoys is a limited waiver of statutory immunity under section 768.28. ***Id.*** (quoting Fla. Stat. § 728.28(2) (1977)).

¶63. For these reasons, we find that ***Hyatt III***'s holding does not apply in this instance.

### IV. Mississippi Policy

¶64. In ***Church***, this Court held that "[a] foreign governmental entity enjoys no greater status under our tort law than any other similarly situated tort defendant." 697 So. 2d at 410. ***Church*** found "no compelling public policy considerations which would dictate that [a foreign governmental entity] should enjoy immunities above and beyond those provided to our citizens." ***Id.***

¶65. ***Church***'s holding was fully compatible with the general rule before ***Hyatt III*** that states were allowed but not constitutionally required to extend sovereign immunity to a sister

24

state as a matter of comity. ***Hall***, 440 U.S. at 425.[9]  Following ***Hyatt III***, Mississippi no longer has the discretion whether to recognize another state's sovereign immunity; it is now constitutionally obligated to do so. ***Hyatt III***, 587 U.S. at 249.

¶66.  But ***Church*** still remains good law with respect to out-of-state entities such as municipalities and their instrumentalities , like JEA.  Mississippi continues to recognize that such entities should enjoy no greater status under our law than any other similarly situated civil defendant absent compelling public policy considerations. ***Church***, 697 So. 2d at 410.[10]

¶67.  Here, JEA has provided no compelling reason(s) why it should enjoy greater status, other than its claim that the Full Faith and Credit Clause mandates that Florida law, specifically section 768.28, should govern based on both ***Hyatt III*** and ***Hyatt II***.  We find that neither ***Hyatt II*** or ***III*** interprets the Full Faith and Credit Clause as JEA would have it.

¶68.   ***Hyatt III*** simply references the clause and reiterates that it "precludes States from 'adopt[ing] any policy of hostility to the public Acts' of other States." ***Hyatt III***, 587 U.S. at 245 (quoting ***Hyatt II***, 587 U.S. at 176).

¶69.  In ***Hyatt II***, the Court began its discussion by reaffirming ***Hyatt I***'s explanation of the Clause and holding that

---

[9] ***Church*** was decided before ***Hyatt I***.

[10]  In ***Horne v. Mobile Area Water & Sewer System***, 897 So. 2d 972, 974 (Miss. 2004).  ***Horne*** held that the chancery court had personal jurisdiction over the City of Mobile and the Board of Water & Sewer Commissioners of the City of Mobile from a complaint filed by numerous Mississippi property owners alleging property damage from the Board's release of significant amounts of water from an Alabama reservoir.  Applying Mississippi's long-arm statute, ***Horne*** said that "Mississippi has a strong interest in adjudicating the dispute because Mississippi residents were injured, Mississippi property was destroyed, and the City and the Board continue to release water." ***Id.*** at 981.

(1) the Clause does not require one State to apply another State's law that violates its "own legitimate public policy," *Franchise Tax Bd.*, supra, at 497-498, 123 S. Ct. 1683 (citing *Hall*, supra, at 424, 99 S. Ct. 1182), and (2) Nevada's choice of law did not "exhibi[t] a 'policy of hostility to the public Acts' of a sister State." *Franchise Tax Bd.*, supra, at 499, 123 S. Ct. 1683 (quoting *Carroll v. Lanza*, [349 U.S. 408, 413, 75 S. Ct. 804, 99 L. Ed. 1183 (1955)].

*Hyatt II*, 578 U.S. at 177 (alteration in original).

¶70.　What *Hyatt II* found violative of full faith and credit in the case was Nevada's decision after *Hyatt I*'s remand to allow for damages against the Board above the statutory cap that would apply to Nevada agencies under similar circumstances.　*Hyatt II*, 578 U.S. at 175.　By doing so, according to the *Hyatt II* majority, Nevada had instituted a special rule that was both "hostile to its sister State[]," and "inconsistent with the general principles of Nevada immunity law . . . ."　*Id.* at 179, 178.

¶71.　But *Hyatt I*'s explanation of the Full Faith and Credit Clause still holds true.　"[T]he Full Faith and Credit Clause does not compel "'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'"　*Hyatt I*, 538 U.S. at 494 (quoting *Sun Oil Co.*, 486 U.S. at 722).　"[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."　*Id.* at 495-96 (alteration in original) (internal quotation marks omitted) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985)).　"Whereas the full faith and credit command 'is exacting' with respect to '[a] final judgment . . . rendered by

26

a court with adjudicatory authority over the subject matter and persons governed by the judgment' it is less demanding with respect to choice of laws.'" *Id.* at 494 (alterations in original) (citation omitted). In short, a state may apply its own law in the face of another state's conflicting statute as long as its choice of law is "neither arbitrary nor fundamentally unfair," *Hyatt I*, 538 U.S. at 494-95 (internal quotation mark omitted) (quoting *Shutts*, 472 U.S. at 818), and does not evince a "'policy of hostility to the public Acts' of a sister State." *Id.* at 499 (quoting *Carroll*, 349 U.S. at 413).

¶72. Here, we find that allowing Promenade to proceed with its claims against JEA in a Mississippi court would not be either arbitrarily or fundamentally unfair to JEA, and it would not be hostile to Florida law.

¶73. Promenade has presented evidence in support of its allegations that JEA knowingly allowed approximately 32,000 tons of bed-ash waste material from its power generating plant to be shipped into Mississippi for commercial use. There is evidence that this was a decision by JEA to save and bypass the costs associated with Florida's regulatory requirements for disposing or storing the material in Florida. Evidence also has been presented that JEA sought to market and sell this material as a product for use in construction projects outside of Florida. And as a product, LA Ash felt no approval from Mississippi was necessary to sell OPF42 in Mississippi as a matter of interstate commerce. There is also evidence that the Mississippi Department of Environmental Quality warned certain individuals that it believed the material was a waste and that if it were sold in Mississippi, they would be doing so at their risk.

¶74. There is further showing that Cedar Bay, another Florida electric utility, had placed firm restrictions on the use of its own ash material and required approval from the receiving state's environmental regulatory agency. There is testimony that "Cedar Bay had a policy that you had to have a BUD permit from the state that you were going to use it in before [Cedar Bay] would allow it to be used in th[at] state." But JEA did not have the same requirement because it considered its ash material a product.

¶75. And there is the claim by Promenade that, unbeknownst to everyone besides JEA, the product that ultimately was delivered to and used at Promenade's site had been adulterated by aluminum after JEA had introduced powdered Kaolin into its fuel mixture that allegedly resulted in the damage that occurred to Promenade's property.

¶76. As we see it, what is alleged to have occurred in Mississippi most likely would not have occurred in Florida given Florida's regulations and, in particular, the fact that the bed ash used at Promenade had not been approved for use as construction fill in Florida. Had it occurred in Florida, though, we cannot say how Florida law would be applied—meaning, whether JEA would have enjoyed immunity under section 768.28.

¶77. We think it bears mentioning that for purposes of section 768.28, Florida courts have held that when the statutory caps provided by section 768.28(5) are found to apply in any cause of action, the governmental entity still has to defend the action to determine its liability above the damages cap in order to support a claims bill to the Florida Legislature. *City of Ft. Lauderdale v. Hinton*, 276 So. 3d 319, 326 (Fla. Dist. Ct. App. 2019) (citing *Gerard v. Dep't of Transp.*, 472 So. 2d 1170, 1172 (Fla. 1985)). In other words, the governmental

28

entity is not immune from suit above the statutory cap. *Id.* (citing *Gerard*, 472 So. 2d at 1172).

¶78. Apart from section 768.28, however, we observe that property interests in Florida, like every other state, are protected from eminent domain takings for public use without just compensation by the United States and Florida Constitutions. U.S. Const. amend. V; Fla. Const. art. 10, § 6. Florida also recognizes that "[w]here no formal exercise of eminent domain power is undertaken, a property owner may file an inverse condemnation claim to recover the value of property that has been *de facto* taken." ***Fla. Dep't of Env't Prot. ex rel. Bd. of Trs. of Internal Improvement Fund v. West***, 21 So. 3d 96, 98 (Fla. Dist. Ct. App. 2009). Section 768.28 does not apply to inverse condemnation claims. ***Dep't of Agric. & Consumer Servs. v. Polk***, 568 So. 2d 35, 38 (Fla. 1990).

¶79. Mississippi likewise recognizes the legal remedy of inverse condemnation for property owners whose property was taken for public use where no formal eminent domain proceeding was initiated. ***Jackson Mun. Airport Auth. v. Wright***, 232 So. 2d 709, 712-15 (Miss. 1970). The concept is rooted in the Takings Clause of the Mississippi Constitution. Miss. Const. art. 3, § 17. Similar to Florida law, such claims fall outside the strictures of the MTCA. ***McLemore v. Miss. Transp. Comm'n***, 992 So. 2d 1107, 1109-11 (Miss. 2008).

¶80. Mississippi's constitution also contains a damage provision that further protects private property rights in this state. *Id.* at 1110-11. *McLemore* explained that prior to the 1890 Constitution, the "Legislature could limit a landowner's recovery to compensation for the land appropriated for public use . . . ." *Id.* at 1111 (quoting ***Parker v. State Highway***

29

*Comm'n*, 173 Miss. 213, 162 So. 162, 164 (Miss. 1935). But with the adoption of section 17, "any effort on the part of the Legislature to shield the government or any arm thereof from payment of damages occasioned by it on the appropriation of land would be futile and of no effect." *Id.* (quoting *Parker*, 162 So. at 164). Section 17 is "self-executing," and it "is mandatory." *Id.* (quoting *Parker*, 162 So. at 164). Further, section 17 "requires payment for damage to private property taken for public use whether such damage be the result of negligence or not." *McDowell v. City of Natchez*, 242 Miss. 386, 135 So. 2d 185, 186 (1961) (quoting *City of Jackson v. Cook*, 214 Miss. 201, 58 So. 2d 498, 500 (1952)); *see also Baker v. Miss. State Hwy. Comm'n*, 204 Miss. 166, 37 So. 2d 169, 170 (1948) (recognizing that such damages claims "are purely consequential" when "not a condemnation proceeding").[11]

¶81. We point this out to illustrate that a Mississippi property owner whose property was damaged by a Mississippi public utility engaging in the same type of conduct alleged here very likely could establish a viable inverse condemnation case against that entity, notwithstanding the MTCA. And we think a Florida property owner could as well, irrespective of Florida's tort claims act.

¶82. Promenade, however, cannot state an inverse condemnation claim in this instance because, as JEA rightly argues on appeal, JEA has no authority to condemn property in

---

[11]*Baker* also recognized that there may be exceptional circumstances when the before-and-after rule (the difference between the fair market value of the damaged property before, as compared to the value after) would not be the proper test. *Baker*, 37 So. 2d at 176. "In these exceptional cases all that can be done is to apply thereto a rule supported by reason, logic, and common sense, designed to result, as far as humanly possible, in the ascertainment of the true, accurate damage the property owner has suffered." *Id.*

Mississippi for public use.

¶83. But because Promenade cannot assert an inverse condemnation claim against JEA does not also mean that Promenade should be without redress similar to what article 3, section 17, provides. As one jurisdiction has recognized, "[i]nverse condemnation is similar to a products liability manufacturing defect case in that the plaintiff in both types of cases is not required to prove fault." *Greenway Dev. Co., Inc. v. Borough of Paramus*, 750 A.2d 764, 769 (N.J. 2000) (citing *Myrlak v. Port Auth. of N.Y. & N.J.*, 157 N.J. 84, 96, 723 A.2d 45 (1999)). Likewise, section 17 "requires payment for damage to private property taken for public use whether such damage be the result of negligence or not." *McDowell*, 135 So. 2d at 186 (quoting *Cook*, 58 So. 2d at 500). Both types of claims require the plaintiff to establish a proximate cause of the plaintiff's damages. *See id.* at 186-87 (plaintiff was required to establish "the line of causation" between the work done by the city and the damage to the plaintiff's property); *3M Co. v. Johnson*, 895 So. 2d 151, 161 (Miss. 2005) (plaintiff must prove "the defective and unreasonably dangerous condition of the product was the proximate cause of the plaintiff's damages").

¶84. JEA acknowledges that this is a product liability construction case. And we find that genuine issues of material fact abound as to whether, at the time JEA's product left its plant in Jacksonville: "(1) the product was designed in a defective manner; (2) the defective condition rendered the product unreasonably dangerous to [Promenade]; and (3) the defective and unreasonably dangerous condition of the product was the proximate cause of the [Promenade's] damages." *Johnson*, 895 So. 2d at 161.

31

¶85. We find nothing violative of full faith and credit or comity principles to allow Promenade to proceed with its case against JEA in the Harrison County Circuit Court, seeking damages similar to those that would be allowed in a case brought against a Mississippi public utility under article 3, section 17, of the Mississippi Constitution. Neither the MTCA nor section 768.28 is applicable to this case.

## CONCLUSION

¶86. We reverse the circuit court's judgment of dismissal and remand this case to the circuit court for further proceedings consistent with this opinion.

¶87. **REVERSED AND REMANDED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS AND BRANNING, JJ., CONCUR.**